**LEECO STEEL PRODUCTS, INC., an Illinois corporation, Plaintiff,**

v.

**FERROSTAAL METALS CORPORATION, a California corporation; Usinas Siderurgicas de Minas Gerais SA, a Brazilian corporation; and Lyman Steel Co., an Ohio corporation, Defendants.**

No. 87 C 4062.

United States District Court, N.D. Illinois, E.D.

Oct. 28, 1988.

David F. Gitles, Chicago, Ill., for plaintiff.

Stephen E. Smith, Gerald P. Callaghan, Robert E. Mahoney, Siemon, Larsen, Mattlin & Purdy, Gary A. Grasso, Mark M. Christerson, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

This is a story about four companies and a warehouse full of steel. It started out as a tale about the steel that nobody wanted, but now it has become a tale about the steel that everyone wants. Unfortunately for the parties in this case, this opinion will not be the last chapter of the story.

It all started in 1984. Lyman Steel Company, a distributor of steel located in Cleveland, Ohio, began in that year to purchase steel plate from Usinas Siderurgicas de Minas Gerais, S.A., a company that everyone in this case refers to as "Usiminas." Usiminas is a Brazilian-based steel manufacturer. Around October 17, 1986, over 2000 metric tons of steel plate ordered by Lyman from Usiminas arrived in Cleveland via the vessel *Marilyn O.* That is when the trouble started. First the shipment had problems clearing customs. Then Lyman inspected the steel and found that it did not meet its specifications. After several weeks of wrangling, Lyman offered to purchase the steel plate, but only at a lower price. Usiminas firmly rejected the offer, and telexed Lyman on December 30, 1986 that it wanted to show the steel—which was now sitting in Lyman's warehouse—to another buyer.

Now meet the other characters in this story. Usiminas had given Ferrostaal Metals Corporation ("FMC"), a California corporation with an office in Illinois, the task of finding the steel a new home. FMC contacted Leeco Steel Products, Inc., an Illinois corporation with its principal place of business in Illinois. On January 6, 1987, representatives from Leeco and FMC visited Lyman's warehouse to examine the steel. Two days later Usiminas telexed Lyman that it had transferred title to the steel to FMC. Lyman then telephoned Usiminas to inform it that Lyman had pre-sold some of the steel before it had arrived in Cleveland.

Unbending in its desire to meet these orders, Lyman telexed FMC's Illinois office on January 13 that it sought a release from Usiminas and that it would purchase all of

the steel upon receipt of the release. On January 16, FMC telexed Lyman that, because of Lyman's breach, it had sold the steel to another company, which everyone now knows was Leeco. For the next thirteen days, Lyman and FMC had repeated contacts with one another (no less than twenty telexes and four telephone calls) discussing the disposition of the steel. On January 29, 1987, Lyman received an invoice from Usiminas for the steel. Lyman paid the original price for the steel, less a balance against claims.

Finding itself without any steel, Leeco filed a complaint in the Circuit Court of Cook County on March 25, 1987. Leeco alleged in that complaint that Usiminas and FMC had breached their contract to deliver the steel. Additionally, Leeco claimed that FMC, Usiminas, and Lyman were jointly and severally liable for the conversion of the promised steel. Usiminas and FMC removed the action to this court, then filed a cross-claim against Lyman for conversion. Several motions are now pending.

The first and most important motion comes from Lyman. Lyman claims that this court has no jurisdiction over it or, in the alternative, a better venue exists in the Northern District of Ohio. Lyman also seeks to dismiss the counts against it for failure to state a claim. First things first: A federal court has personal jurisdiction over a party in a diversity suit if the state court in which the federal court sits would have such jurisdiction. See *Snyder v. Smith*, 736 F.2d 409, 415 (7th Cir.1984). Leeco, FMC, and Usiminas contend that this court has personal jurisdiction over Lyman under the Illinois "long-arm" statute, Ill.Rev.Stat. ch. 110, ¶ 2–209(a) (1983), and the Illinois "doing business" doctrine. This court finds that it lacks personal jurisdiction over Lyman under both theories of jurisdiction.

■ The Illinois long-arm statute reads, in pertinent part:

Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person ... to the jurisdiction of the

courts of this state as to any cause of action arising from the doing of any such acts:

(1) The transaction of any business within this State;

(2) The commission of any tortious act within this State.

*Id.* The problem with Leeco, FMC and Usiminas's use of long-arm jurisdiction is that, according to the statute, the cause of action asserted against the party must arise from the transaction of business or the committing of the tort. These parties assert that Lyman converted their steel by selling it to someone else. None of these parties suggests, however, that Lyman originally obtained their steel or sold it out from under them through the transaction of any business in Illinois, which is what is required for jurisdiction under ¶ 2–209(a)(1). See *R.W. Sawant & Co. v. Allied Programs*, 111 Ill.2d 304, 312, 95 Ill.Dec. 496, 500, 489 N.E.2d 1360, 1364 (1986) (no personal jurisdiction over out-of-state company where no business transacted in Illinois).

Nor can these parties establish that the alleged tortious act occurred in Illinois. Under Illinois law, "[o]ne claiming conversion must show a tortious conversion of the chattel," defined as the unauthorized assumption of the right to possession or ownership, "a right to property in [the chattel], and a right to immediate possession which is absolute and unconditional and not dependent upon the performance of some act." *Jensen v. Chicago & Western Indiana R.R. Co.*, 94 Ill.App.3d 915, 932, 50 Ill.Dec. 470, 484–85, 419 N.E.2d 578, 592–93 (1981). As will be examined below, this court does not believe that Leeco can maintain a cause of action for conversion against any of these parties. But for purposes of considering this court's jurisdiction over Lyman, this court will assume that Leeco could make out the tort.

At all times after the *Marilyn O* arrived in the United States and before Lyman filled its customers' orders, the steel that Lyman allegedly converted has been lying in Ohio. Sales of it to other companies occurred in Ohio. Lyman's refusal to yield

possession over the steel to Usiminas, FMC, or Leeco emanates from Ohio. From all of this, the court concludes that the tort complained of here occurred in Ohio. Leeco contends that the tort occurred in Illinois because it resides in Illinois, and that it felt the harm of Lyman's conversion in Illinois. This contention runs, however, against the holding of the Illinois Supreme Court in *Green v. Advance Ross Electronics Corp.*, 86 Ill.2d 431, 56 Ill.Dec. 657, 427 N.E.2d 1203 (1981). There the court ruled that the Illinois courts had no jurisdiction over a Texas defendant where the last act of his alleged tort occurred in Texas, even though the victim of the tortious behavior was the Texas subsidiary of an Illinois corporation. The last act of Lyman's alleged tort, its refusal to transfer possesion of the steel to Usiminas or its agent FMC, occurred in Ohio. Leeco's economic loss in Illinois is insufficient alone to give this court jurisdiction over a party residing outside Illinois.

■ Having found that it lacks personal jurisdiction over Lyman based on the Illinois long-arm statute, the court must now decide whether Lyman was operating within the state of Illinois to the extent necessary for the court to have jurisdiction over it under the "doing business" doctrine. Like jurisdiction under the Illinois long-arm statute, jurisdiction under the Illinois doing business doctrine is not found every time a party has the minimum contacts necessary to satisfy due process. See *Cook Assoc., Inc. v. Lexington United Corp.*, 87 Ill.2d 190, 200–01, 57 Ill.Dec. 730, 740–41, 429 N.E.2d 847, 852 (1981). Rather, the doing business doctrine is a creature of the Illinois courts, one that relies wholly upon case-by-case development in those courts. Sitting as a court with diversity jurisdiction, this court is obliged to reflect upon the Illinois courts' development of the doing business doctrine, and apply those developments to the facts of this case.

Since the Supreme Court's seminal discussion of the minimum contacts necessary to meet the requirements of due process in *Internat. Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)—a case which considered Washington's doing business doctrine—the Illinois Supreme Court has considered the doctrine on seven occasions. In *The Hertz Corp. v. Taylor*, 15 Ill.2d 552, 155 N.E.2d 610 (1959), the court found that Illinois had jurisdiction over George Taylor's employer, Alcoa Steamship Company, because it maintained a Chicago office from which it solicited freight and passenger business. Two months later, the court held that a New York-based manufacturer of adding machines was not doing enough business in Illinois to place it under the jurisdiction of the Illinois courts. In *Grobark v. Addo Machine Co., Inc.*, 16 Ill.2d 426, 158 N.E.2d 73 (1959), defendant Addo had sold its machines to an Illinois wholesaler, Grobark, for fourteen years. Addo wished to obtain the names of Grobark's customers and dealers, and had carried on negotiations with Grobark in Chicago to make Grobark the exclusive distributor of Addo machines for the Greater Chicago area. The parties later completed a contract through the mail between New York and Chicago. The contract allowed Grobark to place discount orders for machines with Addo's New York office. Upon receipt of an order, Addo would then place the machines with independent carriers who would ship them to Chicago.

The *Addo* court concurred with the Illinois Appellate Court that Addo was not doing business in Illinois. Apart from having its president come to Chicago to negotiate the distributorship agreement, Addo had no physical contacts with Illinois. Addo never shipped anything by its own carriers to Illinois, and its contract with Grobark was insufficient to make Grobark its agent. The court cited *Internat. Shoe* and *Nelson v. Miller*, 11 Ill.2d 378, 143 N.E.2d 673 (1957), to stress that some sort of physical presence in Illinois is necessary to establish jurisdiction under the Illinois doing business doctrine. *Grobark*, 16 Ill. 2d at 436–37, 158 N.E.2d 73.[1]

---

1. As the Illinois Appellate Court noted in *Mergenthaler Linotype v. Storch Enterprises*, 66 Ill.

App.3d 789, 23 Ill.Dec. 352, 383 N.E.2d 1379 (1978), the appellate courts of Illinois have in-

The Illinois cases that have considered the doing business doctrine since *Grobark* have maintained its requirement of a meaningful physical presence within the state. See *St. Louis–San Francisco Ry. v. Gitchoff*, 68 Ill.2d 38, 11 Ill.Dec. 598, 369 N.E.2d 52 (1977) ("doing business" jurisdiction over railroad where railroad maintained sales office in Chicago with seven salaried employees, and an office for direction of Illinois rail traffic in Lovejoy, Illinois); *Braband v. Beech Aircraft Corp.*, 72 Ill.2d 548, 554–55, 21 Ill.Dec. 888, 891, 382 N.E.2d 252, 255 (1978) ("jurisdiction over a foreign corporation has traditionally required the finding that it was 'present and doing business'" within Illinois; jurisdiction found over out-of-state corporation where corporation had distributorship contract with Illinois company that obligated company to perform all warranty, maintenance and repair of planes manufactured by corporation, even if not sold in Illinois; corporation's agents visited company often and advertised frequently in Illinois); *Cook Assoc.*, 87 Ill.2d at 190, 57 Ill.Dec. 730, 429 N.E.2d 847 (no "doing business" jurisdiction over out-of-state corporation whose employees attended three trade shows in Chicago, making a small volume of sales there; no Illinois employees, offices, or telephone numbers); *Maunder v. DeHavilland Aircraft*, 102 Ill.2d 342, 80 Ill.Dec. 765, 466 N.E.2d 217 (1984) ("doing business" jurisdiction over foreign corporation whose wholly owned subsidiary had its principal place of business in Illinois); *Sawant*, 111 Ill.2d at 304, 95 Ill.Dec. 496, 489 N.E.2d 1360 (no "doing business" jurisdiction over New York corporation that had no activities in Illinois). The court's adherence to this requirement reflects the essence of the doing business doctrine, which Justice Cardozo once described as extending the jurisdiction of a state's courts to those who operate within the state " 'not occasionally or casually, but with a fair measure of permanence and continuity.' " *Maunder*, 102 Ill.2d at 351, 80 Ill.Dec. 765, 466 N.E.2d 217, quoting *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 267, 115 N.E. 915, 917 (1917).

Lyman's contacts with Illinois in the case before this court are more attenuated than those in any of the cases cited above where the Illinois courts found jurisdiction by reason of the doing business doctrine. FMC negotiated a contract with Leeco in Illinois, to be performed in Illinois. Lyman was never a party to that contract. Lyman employees have never visited Leeco, nor have they visited the state of Illinois in the last five years. Lyman has never had any offices in Illinois. All of its sales are F.O. B. Cleveland. The only "contacts" Lyman has with Illinois are four accounts with Illinois customers, totalling five percent of Lyman's sales volume. The record is void of any indication, however, that these accounts physically tie Lyman to Illinois. As shown above, such a tie is a prerequisite for jurisdiction under the Illinois doing business doctrine. This court thus finds that Lyman was not doing business in Illinois in such a way as to place it under the jurisdiction of the Illinois courts.

Even if Leeco, Usiminas, and FMC were to establish that either the Illinois long-arm statute or its "doing business" doctrine provide grounds for this court to extend its jurisdiction over Lyman, that would not settle the issue. This court would have to be satisfied further that Lyman had sufficient contacts with Illinois "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Internat. Shoe*, 326 U.S. at 316, 66 S.Ct. at 158, quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61

terpreted the decision of the Illinois Supreme Court in *Gray v. American Radiator & Standard Sanitary Corp.*, 22 Ill.2d 432, 176 N.E.2d 761 (1961), as overruling that part of *Grobark* which held that physical presence was necessary under ¶ 2–209(a)(1), the "transaction of any business" prong of the Illinois long-arm statute. *Mergenthaler*, 66 Ill.App.3d at 797–98, 23 Ill.Dec. 352, 383 N.E.2d 1379. There is no suggestion in *Mergenthaler* that the Illinois Supreme Court has eliminated the physical presence requirement for doing business jurisdiction. In fact, the court in *Mergenthaler* found no jurisdiction based on the doing business principle, but it did find jurisdiction under ¶ 2–209(a)(1). See *Mergenthaler*, 66 Ill.App.3d at 796–99, 23 Ill.Dec. 352, 383 N.E.2d 1379.

S.Ct. 339, 343, 85 L.Ed. 278 (1940). As the Seventh Circuit noted in *Saylor v. Dyniewski*, 836 F.2d 341, 344 (7th Cir.1988), recent Supreme Court decisions have emphasized that the state's assertion of jurisdiction over the party should be forseeable. Moreover, the party should have to perform voluntary acts that indicate that it assents to that state's jurisdiction.

Assertion of Illinois jurisdiction in this case was arguably forseeable. Lyman telexed and phoned FMC on several occasions in the two weeks following Lyman's discovery that it would have a problem meeting its customer's orders. These acts could hardly be described, however, as constituting voluntary assent to jurisdiction. Lyman had contracted to sell some of the steel before the *Marilyn O* arrived, let alone before Usiminas contacted an Illinois company to find another buyer. Knowing that it could have a problem meeting its orders, Lyman sought to negotiate an end to the dispute with Usiminas. It included FMC in the discussions. Lyman could have chosen, of course, to ignore FMC entirely and deal with Usiminas alone, but Lyman could have reasonably believed that this might not have resulted in a quick settlement. It offends traditional notions of "fair play" and "substantial justice" to extend jurisdiction over a party simply because it sought to settle a dispute.

This court thus holds that it has no jurisdiction over Lyman, and so it dismisses Leeco, Usiminas, and FMC's claims against Lyman. Because it has no jurisdiction over Lyman, the court does not need to rule on Lyman's motion to transfer venue. It will rule, in effect, on Lyman's motion to dismiss Leeco's conversion claim, however. This is because FMC and Usiminas have moved to dismiss the conversion claim, and the argument that frees FMC and Usiminas from this claim would have freed Lyman too.

■ As noted above, in order to bring a claim for conversion, the party must prove it has a property right in the contested chattel and the immediate, absolute right to possess it. See *Jensen*, 94 Ill.App.3d at 932, 50 Ill.Dec. 470, 419 N.E.2d 578. Under Illinois law, this rule is as rigid as the chattel in dispute here. Leeco asserts that it has a sufficient property interest in the steel to bring a claim for its conversion by virtue of its contract with Usiminas and FMC. This court disagrees. All that Leeco has as a result of its contract is an interest in the performance of the contract, or, alternatively, a right to damages upon its breach. It does not become the owner of the steel until it has tendered consideration and Usiminas and FMC accept it.

Leeco asks this court to find that it has become the equitable owner of the steel merely because it was prepared to pay for it. Leeco cites no authority, however, for the proposition that a contract gives a party a property interest in the subject matter of the contract prior to full performance by the parties. There are Illinois cases to the effect that a binding contract for the sale of real estate creates an equitable interest for the buyer in the land prior to closing (see, for example, *Shay v. Penrose*, 25 Ill. 2d 447, 449, 185 N.E.2d 218, 219–20 (1962) [2]), but Leeco presents no arguments as to why the court should extend this rule to steel contracts.[3] This court thus concludes that Leeco does not have a property interest in the steel sufficient for it to bring a claim for its conversion. Moreover, Leeco cannot establish the third element of the tort, its immediate right to possess the chattel. Leeco's right is contingent: Usi-

---

**2.** Whether Leeco realized it or not, its argument involves a play on words. The principle expressed in *Shay* is described as the doctrine of "equitable conversion:" the conversion, or changing, of a contractual interest into a property interest. What Leeco has thus tried to do here is use the doctrine of equitable conversion to allow it to bring suit for relief from the defendants' tort of conversion—the unlawful deprivation of an owner's right to possess his property.

**3.** Perhaps there are no arguments. Historically, courts have treated real estate contracts differently from contracts for sale of chattels, especially when applying equitable remedies. See E.D. Grigsby, 1 Illinois Real Property §§ 4–7 (1948); Samuel Williston, 7 Contracts § 927 (Jaeger ed. 1963).

minas and FMC must accept Leeco's money before Leeco has a possessory interest in the steel.

Through its conversion count, Leeco has made a feeble attempt to characterize a garden-variety contract matter as something else. This court will not indulge Leeco in this attempt. Nor will it consider Leeco's self-styled "motion or constructive trust"—a request for some sort of interim relief pending the outcome of this dispute. If Leeco wants a preliminary injunction or a temporary restraining order, it should file for them properly. If it wants relief that it did not request in its complaint, it should amend the complaint. The court does not look kindly upon arguments that waste its time.

■ The last motion to be considered now is Usiminas and FMC's motion to dismiss Leeco's breach of contract claim. Usiminas argues first that the contract here was between Leeco and FMC, and thus it cannot be held liable for its breach. Usiminas has stated elsewhere, however, that FMC was acting as its agent; if this is correct, Usiminas could be held liable on the contract. Next Usiminas and FMC contend that the contract releases them from performance when circumstances beyond their control prevent such performance. The defendants contend that this provision appeared as ¶ 18 on the back of the contract that Leeco attached to its complaint as Exhibit A. Unfortunately, Leeco did not submit copies of the back sides of any of the pages of the contract; on a motion to dismiss, this court can look only at the complaint, exhibits attached to the complaint, and undisputed facts. See Charles A. Wright and Arthur R. Miller, 5 Federal Practice and Procedure § 1357 (1969). Based on the information presently before the court, dismissal of the contract claim is not warranted.

In summary, Lyman's motion to dismiss all claims against it for want of personal jurisdiction is granted. Usiminas and FMC's motion to dismiss Count 2 is granted, and all of their motions to dismiss Count 1 are denied. Leeco's motion for constructive trust is denied.